**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

BANCORPSOUTH BANK, a Mississippi State )
Bank,                                  )
                                       )
            Plaintiff,                 )
                                       )          CAUSE NO.  4:11-CV-9
vs.                                    )
                                       )
ENVIRONMENTAL OPERATIONS INC., a       )
Missouri corporation; GEOTECHNOLOGY,   )
INC., a Missouri corporation; AND THE  )
CLAYTON ENGINEERING COMPANY,           )
INC., a Missouri corporation           )
                                       )
            Defendants.                )
                                       )

## COMPLAINT

COMES NOW Plaintiff BancorpSouth, a Mississippi State Bank, by and through its undersigned counsel and for its Complaint against Defendants Environmental Operations Inc. ("EOI"), Geotechnology Inc. ("Geotech"), and The Clayton Engineering Company, Inc. ("CEC") alleges as follows:

## PARTIES

1.      Plaintiff BancorpSouth Bank ("Bancorp") is a Mississippi state bank and is successor by merger to The Signature Bank, which maintains its headquarters and executive offices in Tupelo, Mississippi.

2.      Environmental Operations Inc. ("EOI") is a Missouri corporation with a principal place of business at 1530 South Second Street, Suite 200, St. Louis, Missouri 63104, and engaged in the business of environmental remediation and together with Geotechnology, Inc. and The Clayton Engineering Company, Inc. prepared and implemented an environmental remediation plan or plans affecting the Property.

3.     Geotechnology Inc. ("Geotech") is a Missouri corporation with a principal place of business at 11816 Lackland Road, St. Louis, Missouri  63146, and engaged in the business of environmental remediation and together with EOI and The Clayton Engineering Company, Inc., prepared and implemented an environmental remediation plan or plans affecting the Property.

4.     The Clayton Engineering Company, Inc. is a Missouri corporation with a principal place of business at 11920 Westline Industrial Drive, St. Louis, Missouri 63146, and engaged in the business of, among other things, professional design, civil engineering, land surveying, and construction layout services.

## JURISDICTION AND VENUE

5.     This Court has exclusive jurisdiction over the controversy and jurisdiction over the parties under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as amended, 42 U.S.C. §9601, et seq., ("CERCLA"), Section 113(b), 42 U.S.C. 9613(b), irrespective of the amount of damages or residence of the parties because the facility at which damages have been incurred is within the Eastern District.

6.     This Court also has subject matter and diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332 as (i) at least one of the allegations set forth herein present federal questions and/or cause(s) of action that arise under federal law; and (ii) there is complete diversity of citizenship of the parties in that the Plaintiff is organized and has its principal place of business in Tupelo, Mississippi, the Defendants are all residents of Missouri and maintain a principal places of business in Missouri, and the amount in controversy exceeds $75,000.

7.      Venue is proper in the Eastern District of Missouri under 28 U.S.C. §1391(a) because the events, acts, and omissions giving rise to these claims occurred in this District and the Defendants are subject to personal jurisdiction in the District.

**GENERAL FACTUAL ALLEGATIONS**

8.      On or about March 19, 2001, the City of Hazelwood published a request for proposals with regard to the development of that certain property now known as the Hazelwood Logistics Center, as defined in that certain site map annexed hereto and incorporated herein by reference as *Exhibit A* (the "Property").

9.      In response to the published request, McEagle Development LC submitted a development proposal.  The City of Hazelwood thereafter adopted an ordinance selecting McEagle Development LC as the developer of the Property.

10.     Prior to November 13, 2001, Geotechnology, Inc. was retained for the purpose of analyzing environmental issues and remediation requirements relative to portions of the Property on which there was then situated a landfill site, requiring environmental remediation due to waste and hazardous materials historically located at, stored on, and resulting from decomposition of organic matter in and around, the Property.

11.     Upon information and belief, on or about November 13, 2001, Geotechnology Inc. submitted to the County of St. Louis a Phase I environmental report with regard to the Property.  A copy of the Phase I report is attached hereto and incorporated herein by reference as *Exhibit B*.  In preparing the report, and in data collection, testing, and analyses performed in connection with the report, no study was performed to characterize the waste present at the landfill site in terms of biodegradation and landfill gas generation potential, despite that the present of a landfill containing biodegradable materials was known to be the subject of the Geotech investigation.  Geotech was aware and knew that such reports would be relied upon by

3

developers, owners, municipal authorities, state authorities, secured lenders, mortgagees, and others.

12.     On or about July 15, 2002, Hazelwood Commerce Redevelopment Corporation ("HCRC") was formed pursuant to The Urban Redevelopment Corporations Law of Missouri, Sections 353, et. seq., for the specific purpose of acquiring, constructing, maintaining and operating a redevelopment project or projects, such as the environmental remediation and redevelopment of the Property.  As such, HCRC was required to prepare and submit to all applicable governmental authorities, including the City of Hazelwood, a redevelopment proposal, including a development plan, for environmental remediation and redevelopment of the Property.  See, Articles of Agreement for HCRC attached hereto and incorporated herein by reference as *Exhibit C.*

13.     Upon information and belief, on or about October 2, 2002, the City of Hazelwood and HCRC entered into a Development Agreement pursuant to which the City of Hazelwood granted HCRC the right to acquire the Property or portions thereof, including that portion then constituting a landfill site (the "Edwards Landfill" or "Landfill Site") and commonly described as 547 Edwards Avenue, Hazelwood, Missouri, and real property commonly known as 515 Edwards Avenue, Hazelwood, Missouri, by eminent and domain pursuant to Chapter 353, et seq. of the Revised Statutes of Missouri (the "Development Agreement").  HCRC contemporaneously therewith, assigned its acquisition rights to the City of Hazelwood and the City of Hazelwood exercised the acquisition rights to acquire the landfill site and other portions of the Property.  The City of Hazelwood further agreed to and did substitute as plaintiff in that certain condemnation action styled *Hazelwood Commerce Redevelopment Corporation v. Fee Fee Edwards LLC, et al.*,

Case No. 04-CC-000873J, pending before the Circuit Court of St. Louis County. A copy of the Development Agreement is attached hereto and incorporated herein by reference as *Exhibit D*.

14. McEagle Development LC, an affiliate of Hazelwood Commerce Center LLC ("HCC LLC"), thereafter assigned its development rights with regard to the Property to HCC LLC.

15. HCRC thereafter contracted with and retained Defendant Geotechnology Inc. to prepare various environmental reports and to establish with EOI an environmental remediation plan for the Landfill Site. These reports included a Limited Environmental Sampling dated July 2, 2003 and an Environmental Sampling "Edwards Avenue Landfill" dated January 9, 2004. In addition, on or about June 14, 2004, HCRC prepared a Limited Environmental Review with regard to the Property. On or about January 20, 2005, HCRC prepared a Radiation Assessment with regard to the Property. Collectively these reports are referred to herein as "the Environmental Reports". A copy of the June 14, 2004 Review is attached hereto and incorporated herein by reference as *Exhibit E.* Geotech was aware and knew that such reports would be relied upon by developers, owners, municipal authorities, state authorities, secured lenders, mortgagees, and others. In connection with the Environmental Reports, and despite that explicit recommendations were made to screen and beneficially reuse organic and decomposing waste material, no evaluation of the potential impact of biodegration such as landfill gas generation was performed. Further, failures of proper waste delineation processes performed by Geotech caused the study to omit landfill areas later accidentally discovered during implementation of the recommended remedial action.

16.     Upon information and belief, no study or analysis of the existence or remediation of methane was conducted despite that the same was indicated in accordance with normal industry standards governing remediation of landfill areas

17.     Per the Environmental Reports, nine (9) areas of concern were however identified.  The primary area of concern being the Landfill Site.

18.     Upon information and belief, based upon the environmental reports submitted by Geotechnology, Inc. and HCRC, on or about July 26, 2004, the Industrial Development Authority of the City of Hazelwood submitted to the Missouri Department of Economic Development ("MoDED") a Brownfield Tax Credit Application with regard to financing redevelopment of properties, including the Property.  The Brownfield Tax Credit Application is attached hereto and incorporated herein by reference as *Exhibit F.*

19.     On or about April 29, 2005 a Remedial Action Plan was prepared by EOI and Geotech with regard to the Property.  A copy of the Remedial Action Plan is attached hereto and incorporated herein by referenced as *Exhibit G.*   Pursuant to the Remedial Action Plan, Geotechnology, Inc. and EOI proposed, among other things, to excavate, screen, and place certain organic and other materials retrieved from the Landfill Site within an onsite engineered cell, and advised that, together with screening fines, the same would complete remediation of the former landfill.  Specifically, materials passing through screens of an approximately 6 inch diameter such as soil and organic matter ("fines") would be transported to an onsite deep fill zone, compacted, and thereby reused across large portions of the Property previously uncontaminated by environmentally hazardous Landfill Site materials.  Waste passing through the six-inch diameter screens were to be deposited into the onsite engineered cell.  In making such recommendations and plans, neither EOI nor Geotechnology, Inc. tested or reported on the

existence of methane, or the likelihood of generation of methane gas as a natural byproduct of anaerobic decomposition of organic matter within the engineered cell, despite a duty to do so and notwithstanding that the same was indicated per industry standard for landfill remediation.

20.     EOI thereafter also submitted the Remediation Action Plan to the Missouri Department of Natural Resources ("MoDNR") on behalf of HCRC in order to address the areas of concern identified Environmental Reports and advised of its suitability and effectiveness in remediation of the Property.

21.     The Remediation Action Plan acknowledged that HCRC is redeveloping the Property as industrial and warehousing facilities.  Geotech was acting as the oversight consultant and EOI would perform the environmental remediation activities.  The plan further stated that environmental regulatory oversight activities would be performed by MoDNR, and that the Property was enrolled in MoDED for remediation tax credits.

22.     In sum, the Remediation Action Plan proposed to remediate the property by excavation, screening and moving of organic and other materials, including landfill materials, around the Property and within an onsite engineered cell.  The cell was to be constructed of an approximately 24 inch thick clay liner, and capped by an approximately 60 inch clay cap, all of which was to be situated below a water detention basin and inches above the below-ground water table.  Salvaged automobiles and larger waste would be removed and disposed of off site. Building debris from former site structures would be removed and existing site structures will be surveyed for asbestos.  Upon completion of the remediation activities, a final report would be prepared and submitted to MoDNR.  The report would summarize remediation activities and provide sufficient information in order for MoDNR to issue a letter of completion with regard to the onsite environmental issues.  See *Exhibit G.*  The Remedial Action Plan also acknowledged

the presence of volatile and semivolatile organic compounds at the Property, which compounds commonly include methane, and indicated that sufficient testing to detect volatile and semi-volatile organic compounds had been performed.

23.     On July 20, 2005, a Summary of Limited Environmental Sampling was prepared for HCRC.

24.     On September 22, 2005, a Limited Environmental Review was prepared for HCRC.  A copy of the review is attached hereto and incorporated herein by reference as *Exhibit H.*

25.     Each sampling failed to apprise the recipients of the existence, level, or generation potential of methane contaminating the materials and fines retrieved from the Landfill Site, despite that testing for the same constituted a minimum standard of care for the remediation of a Landfill Site, and in particular the construction of the enclosed, below-ground storage of decomposing organic matter within an engineered cell.

*26.*     On October 7, 2005, HCC LLC and The Signature Bank entered into a Land Acquisition Loan Agreement with regard to the Property, which Land Acquisition Loan Agreement provides The Signature Bank a security interest in the Property.  A copy of the Land Acquisition Loan Agreement is attached hereto and incorporated herein by reference as *Exhibit I.*

27.     The Remedial Action Plan was amended by EOI on February 1, 2006 to provide a proposed approach for pumping and discharging trapped water from within the engineered cell area.  No provision was made for the accumulation of methane gas within the cell, despite that by design, the cell would contain organic waste 21 feet in thickness, held in anaerobic conditions, beneath five feet of clay, and with lateral walls and flooring of only 24 inches, i.e., creating conditions for generation of methane gas, as well as ensuring primarily lateral, rather

than vertical, migration of such gas through the surrounding Property.  A copy of the Remedial

Action Plan Amendment 1 is attached hereto and incorporated herein as *Exhibit J*.

28.      In communications between and among Geotech and the Missouri Department of

Natural Resources in 2006, Geotech further acknowledged that the decomposition of organic

materials within the engineered cell constituted an unavoidable process, and one that would

induce settlement of decomposing (and thus shrinking) materials within the cell, detrimental to

the clay cell liner, as well as any buildings and roads constructed upon the surrounding above-

ground area.  Geotech further acknowledged the risk of seepage into the cell of exterior water

from the detention basin above, in the event the cell cap were affected by such settlement.

Despite this, no means of controlling such fluids, or of addressing the accumulation of methane

gas, settlement, and resulting pressure within the cell were proposed.

29.      On June 8, 2006, HCC LLC and EOI entered into an Environmental Services

Agreement with regard to the Property ("Environmental Agreement").  A copy of the

Environmental Agreement is attached hereto and incorporated herein by this reference as *Exhibit

K*.

30.      Per the Environmental Agreement, HCC LLC as developer and EOI as contractor

agreed that EOI would perform the remediation services set forth in the Remedial Action Plan,

and that EOI would provide the services necessary to remediate the Property to receive a "No

Further Action Letter" from the MoDNR.

31.      The Environmental Agreement provides generally that the Property and areas

designate therein would be remediated in exchange for the contract amount.  Among other

things, the Environmental Agreement further reflects that:

a.      EOI and Geotech prepared the Remedial Action Plan;

b.      EOI would provide all labor, equipment, tools, materials and professional environmental remediation services necessary to remediate any solid, liquid, or gaseous substance contaminated by, among other things, gases, substances and mixtures regulated under federal or state environmental laws, including methane, within the premises and portions of the Property identified by the EOI/Geotech Remedial Action Plan;

c.      EOI would complete the work indicated in the Remedial Action Plan whereupon it would obtain a final No Further Action Letter from the Missouri Department of Natural Resources indicating such completion;

d.      The No Further Action Letter would be obtained within 14 months from commencement of work under the Environmental Agreement;

e.      EOI would perform all work in accordance with federal, state, and local environmental laws, regulations and ordinances;

f.      EOI would ensure the engineered cell was not prematurely filled or overloaded by, among other things, ensuring only contaminated materials were introduced into the cell;

g.      All work would be funded by payment of a lump sum amount, regardless of the availability of certain tax credit funding, unless the insufficiency of such funding results from acts or omissions of EOI;

h.      EOI would obtain certain necessary insurances to protect against loss accruing to the developer, among others;

i.      EOI would administer any claims made to it by developer for submission to EOI's insurance carrier(s);

10

j.     EOI represented and warranted that it performed all due diligence regarding the Property to its own satisfaction;

k.     EOI is responsible and shall bear the risk of loss for acts of negligence by EOI or others working under, in connection with, or involved in the project by EOI;

l.     EOI represented and warranted that it possessed sufficient experience and knowledge in projects of the same type and nature as under the Environmental Agreement, and that its work would reflect the standards of work, skill, care, and diligence applicable to an environmental specialist of such experience and knowledge and in similar circumstances; that all work would be performed in a workmanlike manner; that all materials and equipment provided would be free from defects for one year following completion of the project or such further time period as required by MDNR, and that EOI would replace and re-execute all defective work by it or its subcontractors;

m.     EOI also indemnified the builder from liabilities, damages or losses arising from, among other things, losses, liabilities, and damages caused by the negligent acts or omissions or other fault or mistake of EOI, its agents, employees, subcontractors, or anyone employed by them, or which results in strict liability for any indemnitee.

32.     The Environmental Agreement also set forth insurance requirements which included a Premises Pollution Liability Insurance Policy ("PPL Policy") and a Remediation Cost Contamination Insurance Policy ("RCC Policy") that shall collectively provide environmental insurance coverage up to $5,000,000.00.

33.     Per the Environmental Agreement, EOI was to achieve substantial completion with regard to the landfill remediation work, other than capping the engineered cell, within seven

(7) months, and substantial completion to cap within twelve (12) months. All other remediation work was to be completed within fourteen (14) months.

34.     Per the Environmental Agreement, final completion with regard to the remediation work contemplated therein, would occur when the No Further Action Letter from the MoDNR issued.

35.     The compensation set forth in the Environmental Agreement allowed for $5,339,584 for the landfill related work and $1,633,050 for all other remediation work. If the costs would exceed these predetermined amounts, then EOI was required to notify, in writing, HCC LLC and the City of Hazelwood regarding the nature and the extent of excess costs.

36.     On or about June 8, 2006, the City of Hazelwood and Hazelwood Commerce Center LLC entered into a Remediation and Development Agreement (the "Remediation and Development Agreement") in which the City of Hazelwood agreed to enter into a Real Estate Purchase Agreement with HCC LLC to sell the landfill site to HCC LLC. Upon execution of said Real Estate Purchase Agreement, HCC LLC was to deliver $2,450,000 to the City of Hazelwood as part purchase money for the landfill site. The City of Hazelwood would then deposit the funds as an initial contribution in accordance with the Remediation and Development Project Trust Indenture (the "Project Trust Indenture"). A copy of the Remediation and Development Agreement is attached hereto and incorporated herein as *Exhibit L.* A copy of the Project Trust Indenture is attached hereto and incorporated herein as *Exhibit M*.

37.     On or about June 8, 2006, the City of Hazelwood and HCC LCC entered into a Purchase and Sale Agreement with regard to the Property. A copy of the Purchase and Sale Agreement is attached hereto and incorporated herein as *Exhibit N*.

38.     On or about June 8, 2006, HCC LLC, EOI, and The Signature Bank entered into a Collateral Assignment of Environmental Services Agreement and Consent of Contractor (the "Collateral Assignment of Remediation Contracts") in which The Signature Bank, as lender, was granted an assignment and security interest in the contracts for remediation and related services between HCC LLC and EOI, and specifically the Environmental Agreement.  A copy of the Collateral Assignment of Remediation Contracts is attached hereto and incorporated herein by reference as *Exhibit O.*

39.     On or about June 20, 2006, The Signature Bank as lender issued a Loan Commitment to HCC LLC and HCRC, collectively the borrowers.  A copy of the Loan Commitment is attached hereto and incorporated herein by referenced as *Exhibit P.*

40.     On or about August 11, 2006, HCC LLC (n/k/a Hazelwood Logistics Center LLC) and HCRC as borrowers (and collectively referred to hereafter as "Hazelwood") and The Signature Bank entered into a Development Loan Agreement (as amended from time to time, the "Loan Agreement").  A copy of the Loan Agreement is attached hereto and incorporated herein by reference as *Exhibit Q.*

41.     In reliance on, among other things, the above-mentioned studies, reports, analyses, studies, advices, recommendations, approvals, and the expertise and reputations of the Defendants, among other things, The Signature Bank agreed to make a loan available to Hazelwood in the maximum principal amount of $35,197,500.00 (the "Loan"), a portion of which funded the refinancing of a pre-existing lending facility provided for the purpose of land assemblage, and a portion of which was provided for purposes of funding all activities warranted and recommended by Defendants in remediation of pollution and hazardous substances at the Property, and to obtain the requisite No Further Action Letter.

42.     Bancorp is successor by merger to The Signature Bank with regard to the Collateral Assignment of Remediation Contracts, the Loan Agreement, the Loan, and any and all related documents.

43.     The Loan was made for the stated purpose of the environmental remediation by the Defendants and commercial real estate development of the Property by Hazelwood.

44.     The remediation plan called for the trash fill material that was screened from the landfill area on the Property to be placed into an engineered cell constructed in the northwest portion of the redevelopment Property.  Soil that was screened from the trash fill, once safe, would be placed in various fill zones across the redevelopment area.

45.     In August 2007, EOI, in correspondence with the Missouri Department of Natural Resources Brownfields/Voluntary Cleanup Program, discussed the potential of methane gas generation, but in response to such concern, EOI acknowledged that it had not sufficiently considered the matter.  EOI also failed to take such into account in the design or construction of the engineered cell.

46.     EOI agreed that it was responsible to perform the remediation work in accordance with all applicable codes, ordinances and laws, and with the requirements and concepts established in the Environmental Agreement, and is responsible to provide all work or services necessary to complete the remediation work contemplated therein.  (See *Exhibit R*, Attachment No. 1 "Acknowledgment" to Environmental Agreement)

47.     Upon remediating a portion of the Property, the Defendants each created and participated in creating new environmental hazards on the Property resulting from the failure to properly screen fill dirt prior to dispersing such materials across large previously uncontaminated portions of the Property and/or construction an failure to design, construct, and maintain an

14

adequately engineered cell to contain contaminated materials and decomposing organic matter. Specifically, the remedial action proposed for, and constructed upon the Property included the placement of biodegradable waste in an engineered cell and in deep fill areas outside the cell, with no provisions made in the design, construction, or implementation for monitoring or control of the accumulation of landfill gas or liquid leachate.

48.     In April, 2008, photographs of the detention basin constructed atop the engineered cell revealed bubbling gas rising through water and sediment.  In May, 2008, EOI thus purported to collect measurements for methane by "placing a stainless mixing bowl [ ] directly over the bubbling area for approximately five minutes" and then inserting a testing device under the mixing bowl to read the content of the "trapped" air.

49.     Such method for methane testing reflects a significant departure from standard industry means of methane detection and measurement from decomposing organic landfill waste. EOI found no methane using the mixing bowl method.  Based on its "study" of the matter, EOI requested that MDNR consider the potential for methane gas generation or contamination a closed issue.

50.     MDNR declined, and directed EOI to install gas monitoring wells.  Such wells once installed revealed the presence of unacceptably high levels of methane in and around the area of the engineered cell, as well as pervading throughout the Property, and not limited to the originally identified landfill area.

51.     During and after the design, planning, construction, and completion of remediation work, high methane levels arose, were evidenced, and ultimately were recorded across portions of the Property previously uncontaminated by methane, as a direct and proximate result of the conduct, acts, and omissions of the Defendants and each of them.

52.     The methane discovered outside the engineered cell at the Property is in excess of the safe levels such that it is a health concern and it is negatively affecting a significant amount of land that was to be developed.  The engineered cell is insufficiently designed and constructed to contain methane gas, and such gas now emanates from the cell and affects large portions of the Property rendering the same uninhabitable, and preventing construction, and reducing substantially the value of the real Property securing the Loan.

53.     Upon information and belief, due to the discovery of elevated methane readings, substantial portions of the Property cannot be sold as the purported remediation efforts of the Defendants have instead caused extensive contamination.  As a direct and proximate result of the same, the value of the Property has diminished and further construction and sale of lots at the Project cannot proceed pending further remediation of the present conditions.

54.     Upon information and belief, the expense required to remediate the present contamination, caused by the Defendants and each of them, exceeds $10 million, per the estimates, studies, and statements of Defendant Geotech.

55.     On or about June 1, 2008, HCC LLC changed its name to Hazelwood Logistics Center LLC ("HLC LLC").  A copy of the Amendment to Articles of Organization that reflect the change is attached hereto and incorporated herein as *Exhibit S*.  As a result, documents relating to the Loan were amended accordingly.

56.     Hazelwood is in default of its obligations under the Loan and Loan Agreement including failure to pay Loan balances in full at maturity, which occurred October 30, 2009.

## COUNT I:  CLAIM FOR COST RECOVERY AND
## DECLARATORY RELIEF UNDER CERCLA

57.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 56.

58.     The Property is a "facility" as that term is defined under CERCLA.   Cf. CERCLA §§ 101(9) and 107(a).  42 U.S.C. 9601(9), 9607(a).

59.     The Plaintiff is a financial institution with a security interest in the Property.

60.     The Defendants are each within a class of responsible parties pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) that have caused and are causing the release of hazardous substances at the Property, both because they are owners or operators of the facility at times of disposal or release relevant to this Count, and because they have arranged for or carried out the disposal or release of hazardous substances at the Property.

61.     On information and belief, the Defendants knew since at least 2001 that there were illegally disposed materials, including asbestos, medical wastes, and leaking and empty drums, including hazardous substances, such as but not limited to waste paints, thinners, lubricants and industrial cleaners, in the ground and groundwater at the Property.  These disposed materials and others at the Property include CERCLA "hazardous substances", including chemical compounds classified as volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), metals, total petroleum hydrocarbons (TPH), pesticides, and polychlorinated biphenyls (PCBs).  Nevertheless, Defendants' activity at the Property included the deliberate disturbance, unearthing, spilling, moving and re-releasing of these materials and compounds, including hazardous substances, to the environment at and from the Property.

62.     The release of hazardous substances at the Property by Defendants has caused Plaintiff to incur response costs consistent with the National Contingency Plan, such as

17

investigatory and other expense to try to understand, monitor and evaluate the conditions, environmental releases and hazards at the Property.

63.     On account of the foregoing, Plaintiff requests an order awarding it damages in the amount of its incurred necessary response costs, with interest, per CERCLA Section (107(a)(4)(B).

64.     On account of the foregoing, Plaintiff also requests a declaratory judgment per CERCLA Section 113(g), 42 U.S.C. § 9613(g)(2), finding that if it incurs further response costs at the Property consistent with the National Contingency Plan, the Defendants are liable to Plaintiff for those costs.

## COUNT II:  BREACH OF CONTRACT AGAINST EOI

65.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 64.

66.     Bancorp, as assignee, has standing to assert directly against EOI any claims or causes of action arising in connection with the Environmental Agreement.

67.     Bancorp's assignor fully performed its duties and obligations under the Environmental Agreement, and any other contracts between and among the same.

68.     EOI is in breach of its obligations under the Environmental Agreement for, among other things, EOI's failure to properly investigate, detect, account for, and remediate methane gas and the generation of methane gas by means of anaerobic decomposition; EOI's failure to provide all labor, equipment, and professional environmental remediation services necessary to remediate the Property for environmental purposes; EOI failed to timely obtain a final No Further Action Letter from the MDNR; EOI established plans and created conditions causing the

contamination of previously uncontaminated portions of the Property such that all or substantially all of the Property has been rendered unusable, unsafe, and devoid of commercial viability; EOI failed to perform its work in accordance with all federal, state, and local environmental laws, regulations, and ordinances; EOI failed to ensure that the engineered cell was not prematurely filled or overloaded; EOI failed to keep or maintain necessary insurances; EOI failed to effectively or properly administer claims made by HCC LLC or to submit the same to its insurer; EOI failed to perform its duties under the Environmental Agreement with the care and skill required per industry standard, and negligently damaged the Property by its actions; and EOI misrepresented that it had the experience, skill, and knowledge necessary to formulate the Remedial Action Plan or to remediate the Property for environmental purposes pursuant to the Environmental Agreement.

69.     EOI has breached the implied covenant of good faith and fair dealing with regard to the Environmental Agreement in that EOI has, at all times, failed and refused to adequately investigate or test for methane, to submit claims to its insurer, and to otherwise perform its obligations under the Environmental Agreement with the necessary care, knowledge, and skill required.

70.     Bancorp, as assignee of the Environmental Agreement and as holder of the senior debt secured by the Property, has been damaged by the breaches committed by EOI in an amount not less than $10 million.

WHEREFORE Plaintiff Bancorp prays that this Court enter a judgment in its favor and against EOI and enter an order:

a.     Of Judgment against EOI in the amount of not less than $10,000,000;

19

b.      Awarding Plaintiff Bancorp its costs of this action, prejudgment interest and reasonable attorneys' fees; and

c.      Such further and other relief as the Court deems just and proper.

## COUNT III:  NEGLIGENT MISREPRESENTATION AGAINST EOI AND GEOTECH

71.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 70.

72.     EOI and Geotech prepared and submitted various reports, studies, analyses, and recommendations including, without limitation, the Environmental Reports and the Remedial Action Plan (collectively, the "Information and Reports") in the course of business of each such Defendant.

73.     Due to the failure of EOI and Geotech to exercise reasonable care, the information, reports, studies, analyses, recommendations and plans provided in the Information and Reports were false and incomplete.

74.     The Information and Reports were intentionally provided by EOI and Geotech for guidance of a limited set of persons, including, lenders, mortgagees, municipal and state authorities, and HCC LLC for guidance in assessing, analyzing, and making decisions regarding whether to engage in or pursue the Project, or to provide financing therefor.

75.     Plaintiff justifiably relied on the Information and Reports supplied by EOI and Geotech in making the Loan.

76.     As a direct and proximate cause of the falsity and incompleteness of the Information and Reports, Plaintiff has suffered pecuniary loss in the form of damage to the value of the collateral securing the Loan in an amount in excess of $10 million.

WHEREFORE Plaintiff Bancorp prays that this Court enter a judgment in its favor and against EOI and enter an order:

       a.       Of Judgment against EOI and Geotech in the amount of not less than $10,000,000;

       b.       Awarding Plaintiff Bancorp its costs of this action, prejudgment interest and reasonable attorneys' fees; and

       c.       Such further and other relief as the Court deems just and proper.

## COUNT IV:  STRICT PRODUCTS LIABILITY

77.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 76.

78.     Defendants and each of them sold a product, to wit, an engineered containment cell, to hold contaminated and hazardous materials, in the ordinary and normal course of business.

79.     The containment cell is a product, and was then in a defective condition, unreasonably dangerous, when it was put into anticipated use.

80.     The product was used in a manner reasonably anticipated.

81.     Upon information and belief the product was defective or damaged such that it leaks contaminated material, polluting the Property and significantly decreasing its value.

82.     Bancorp was damaged as a direct result of such defective condition as existed when the product was sold.

WHEREFORE Plaintiff Bancorp prays that this Court enter a judgment in its favor and against the Defendants and each of them and enter an order:

      a.     Awarding Bancorp damages that are fair and reasonable, and in an amount not less than $10 million;

      b.     Awarding Plaintiff Bancorp its costs of this action, prejudgment interest and reasonable attorneys' fees; and

      c.     Such further and other relief as the Court deems just and proper.

## COUNT V: NEGLIGENCE AGAINST ALL DEFENDANTS

83.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 82.

84.     The Defendants and each of them had a duty to adhere to a standard of reasonable care during its environmental remediation of the Property.

85.     Upon information and belief, the Defendants and each of them were negligent in preparing the Remedial Action Plan, executing the same, in the design and construction of an engineered cell performing the remediation activities as they relate to the cleanup of the Landfill Site and Property.

86.     As a direct and proximate consequence of negligent acts of Defendants' and each of them, Bancorp has suffered damages in that the value of its collateral has diminished.

WHEREFORE Plaintiff Bancorp prays that this Court enter a judgment in its favor and against the Defendants and each of them, jointly and severally, and enter an order:

      a.     Awarding Bancorp damages that are fair and reasonable;

      b.     Awarding Plaintiff Bancorp its costs of this action, prejudgment interest and reasonable attorneys' fees; and

      c.     Such further and other relief as the Court deems just and proper.

**COUNT VI:  STRICT PRODUCTS LIABILITY AGAINST EOI AND GEOTECH**

87.     Plaintiff realleges and incorporates by this reference paragraphs 1 through and including 86.

88.     EOI and Geotech sold a product, namely remediated, screened fines derived from contaminated material removed from the Property, and as provided in the Remedial Action Plan, in the normal course of business of each of them.

89.     The product was then in a defective condition, unreasonably dangerous, when it was put into anticipated use.

90.     The product was used in a manner reasonably anticipated in that the fines were spread across portions of the Property.

91.     Upon information and belief the product was defective or damaged such that it contained contaminated material, polluting the Property and significantly decreasing its value.

92.     Bancorp was damaged as a direct result of such defective condition as existed when the product was sold.

WHEREFORE Plaintiff Bancorp prays that this Court enter a judgment in its favor and against EOI and Geotech and enter an order:

a.     Awarding Bancorp damages that are fair and reasonable;

b.     Awarding Plaintiff Bancorp its costs of this action, prejudgment interest and reasonable attorneys' fees; and

c.     Such further and other relief as the Court deems just and proper.

23

**HINSHAW & CULBERTSON LLP**


By: _____/S/ MARK D. BAUMAN_____
MARK D. BAUMAN, #34895MO
HARVEY M. SHELDON
ASHLEY L. NARSUTIS, #55255MO
Gateway One
701 Market Street, Suite 1300
St. Louis, Missouri 63101-1843
P: 314-241-2600
F: 314-241-7428
mbauman@hinshawlaw.com
hsheldon@hinshawlaw.com
anarsutis@hinshawlaw.com
ATTORNEYS FOR PLAINTIFF
BANCORPSOUTH BANK,
A MISSISSIPPI STATE BANK